NOTICE

*The text of this opinion can be corrected before the opinion is published in the*
*Pacific Reporter. Readers are encouraged to bring typographical or other formal*
*errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

STEVEN SAEPHARN,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11170
Trial Court No. 3AN-08-9468 CR

O P I N I O N

No. 2467 — August 7, 2015

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Megan Webb, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge.[*]

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Steven Saepharn appeals his conviction for fourth-degree controlled substance misconduct (possession of methamphetamine). [1] The police found Saepharn's methamphetamine in a plastic bag in his pocket, while the police were conducting a pat-down search of Saepharn's clothing for weapons.

Saepharn argues that the officer exceeded the proper scope of the pat-down search when the officer felt and then removed the plastic bag from Saepharn's pocket. For the reasons explained in this opinion, we conclude that by the time the officer patted Saepharn's pocket and felt a bag or pouch of crystalline substance, the officer had probable cause to believe that the substance was methamphetamine. The officer could therefore lawfully remove the bag from Saepharn's pocket.

*Underlying facts*

On August 21, 2008, while Anchorage police officer Jack Carson was patrolling the Mountain View area of Anchorage, he observed a Honda Civic with a cracked windshield and a defective taillight. Carson activated his patrol vehicle's overhead lights, signaling the driver of the Honda to stop. The driver did not immediately pull over, but continued driving slowly until he turned onto another street and finally stopped.

Another police officer, Sergeant Christopher Sims, was also patrolling in the area and happened to see Carson attempting to stop the Honda. Sims saw the Honda make the turn onto the other street. As the Honda made this maneuver, Sims saw the front passenger door of the Honda open slightly, then close again — as if someone were

---

[1] AS 11.71.040(a)(3)(A).

preparing to leave the vehicle, or as if someone were discarding something out the door. Sims told Carson about what he had seen.

Once the Honda came to a stop, Carson approached the car and spoke with the driver. Saepharn was a passenger in the front seat, and there was a second passenger in the rear of the car.

The driver of the Honda asked Carson for permission to call his mother, and Carson agreed. When the driver pulled his mobile phone from his pocket, Carson saw a cut-off straw in the pocket. When the driver saw that the straw was visible, he tried to push the straw back into his pocket.

Carson later testified that a cut-off straw is "probably the classic piece of drug paraphernalia". These straws are used to ingest controlled substances such as methamphetamine and cocaine in their powder form. Carson relayed his observation of the cut-off straw to Sims.

Because the driver of the Honda had apparently been initially reluctant to pull over when Carson activated his overhead lights, and because the driver had the cut-off straw in his pocket, and because Sims had informed Carson about the quick opening and closing of the front passenger door just before the Honda stopped, Carson decided to obtain more information from the other occupants of the Honda. Carson asked Saepharn to provide his name to Sims, who had positioned himself on the passenger side of the Honda. Saepharn rolled down the window and told Sims his name.

In the meantime, other officers were arriving on the scene. Once this backup arrived, Carson ordered the driver to get out of the car. The driver initially refused, declaring that he had done nothing wrong. When Carson told the driver that either he could exit the vehicle voluntarily or Carson would pull him out of the car, the driver stepped out.

After the driver got out of the Honda, Carson frisked him for weapons. During this frisk, the driver tried to pull away from Carson. After a brief struggle, Carson handcuffed the driver and walked him away from the car.

During Carson's brief struggle with the driver, Sims looked away from the Honda to watch the struggle. While Sims's attention was diverted, Saepharn put his left hand into his left pants pocket. One of the backup officers, Charles Reynolds, saw what Saepharn had done; he drew his pistol and yelled at Saepharn to take his hand out of his pocket. Sims then looked, saw that Saepharn had his hand in his left pocket, and saw that Saepharn was doing something with his hand in the pocket.

Concerned that Saepharn might have a weapon or that he was trying to conceal something, Sims grabbed Saepharn's right arm through the open window and pinned it outside the Honda. Another officer entered the Honda through the driver's door and grabbed Saepharn's left arm. The officers then handcuffed Saepharn and removed him from the Honda.

Once Saepharn was outside the Honda, Sims conducted a pat-down search of Saepharn's clothing for weapons. Saepharn was wearing nylon shorts made from a "pretty thin material."

Sims first patted Saepharn's right shorts pocket. He felt a lighter and cut-off straws as he patted the material against Saepharn's leg.

Next, Sims patted Saepharn's left pocket. In that left pocket, Sims felt a "baggie of some kind" filled with a substance that was "crystalline in nature" — like "brown coarse sugar that you get at the store". When Sims was asked at the evidentiary hearing whether he had to manipulate the bag "a lot" to feel its contents, Sims answered no — that he could easily tell, from its feel, that the baggie contained a crystalline substance.

Sims removed the item from Saepharn's left pocket. It was a small plastic bag containing a crystalline substance — what later proved to be 3.1 grams of methamphetamine.

Sims arrested Saepharn for unlawful possession of a controlled substance. During a more complete search incident to this arrest, Sims found another smaller baggie in Saepharn's right pocket. This baggie contained 0.3 grams of methamphetamine — about a tenth of the amount that was in Saepharn's left pocket. Sims had not detected this baggie during the earlier pat-down search.

Following his indictment, Saepharn moved to suppress this evidence. Saepharn claimed that Sims had exceeded his authority when he removed the first baggie from Saepharn's left pocket, since this baggie did not reasonably appear to be a weapon. After holding an evidentiary hearing, the superior court denied this motion.

Later, after Saepharn hired a different attorney, he filed a second suppression motion, again challenging the pat-down search. The superior court held a second evidentiary hearing and, based on the testimony given at both hearings, the court denied the new suppression motion.

Specifically, the superior court found that the material of Saepharn's shorts was thin, and that when Sims conducted the pat-down search of Saepharn's pockets, the officer could identify the items he felt — the lighter, the cut straws, and the packet of crystalline substance — simply by patting, without improper manipulation. The court concluded that, based on this knowledge, Sims could lawfully remove the baggie of crystalline substance from Saepharn's pocket.

*Why we uphold the superior court's ruling*

Saepharn does not challenge Sergeant Sims's authority to pat down Saepharn's clothing for weapons, but Saepharn argues that this authority to conduct a pat-down did not include the authority to search and remove the baggie of methamphetamine — *i.e.*, an item that was obviously not a weapon — from Saepharn's left pocket.

The law that applies to this situation is set forth in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

In *Dickerson*, the Supreme Court re-affirmed the principle that when the police conduct a pat-down search during an investigative stop, the purpose of the pat-down is to ensure officer safety, and the scope of this search must be limited to "[what] is necessary for the discovery of weapons".[2] It is unlawful for the police to expand the scope of the pat-down beyond this limit in an effort to discover evidence of a crime.[3]

Nevertheless, if the police conduct a pat-down search of lawful scope and, during this pat-down, they detect contraband through their sense of touch, they may seize the contraband.[4] As we are about to explain, the crucial question is whether the physical characteristics of the object, felt through the suspect's clothing, provide probable cause to believe that it is contraband. If so, then the contraband can lawfully be seized.

The *Dickerson* decision described the test as whether the results of the pat-down make the object's identity "immediately apparent".[5] But this is a misleading

---

[2] *Id.*, 508 U.S. at 373, 113 S.Ct. at 2136.

[3] *Ibid.*

[4] *Id.*, 508 U.S. at 375, 113 S.Ct. at 2137.

[5] *Ibid.*

phrasing of the rule. The real test is whether the results of the pat-down establish probable cause to believe that the object is contraband. See the United States Supreme Court's explanation of this point in *Texas v. Brown*, 460 U.S. 730, 741-42; 103 S.Ct. 1535, 1542-43; 75 L.Ed.2d 502 (1983), and the Alaska Supreme Court's explanation of this same point in *Klenke v. State*, 581 P.2d 1119, 1123 (Alaska 1978).

If the typical act of "patting" does not reveal the object as contraband — if its identity as contraband is revealed "only after squeezing, sliding[,] and otherwise manipulating the contents of the [suspect's] pocket", then the seizure of the contraband is unlawful. [6]

On the other hand, when a court assesses whether there was probable cause for the police to remove and seize an object from a suspect's pockets, the court is not limited to the tactile information revealed by the officer's patting. The court can also consider the surrounding circumstances.

As Professor LaFave explains in his work on the law of search and seizure, "although grass-like substances are not per se contraband", the police can justifiably rely on the fact that "[a particular] grass-like substance ... is precious enough to be collected and placed in plastic containers". [7] Similarly, the police can rely on other circumstances such as a suspect's attempted concealment of the item, or a suspect's other reactions upon seeing the police nearby, or the fact that the suspect is in possession of implements that are used for ingesting the suspected drug. [8]

---

[6]   *Id.*, 508 U.S. at 378, 113 S.Ct. at 2138.

[7]   Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (5th ed. 2012), § 3.6(b), Vol. 2, pp. 389-390 (quoting *People v. Symmonds*, 310 N.E.2d 208 (Ill. App. 1974)).

[8]   *Id.* at pp. 391-95.

Although these types of surrounding circumstances are most often considered when deciding whether the seizure of an item was justified by "plain view", these same circumstances can also be considered when the government contends that the seizure of an item was justified by "plain feel" or "plain touch". [9]

In Saepharn's case, the superior court found that Saepharn's shorts were made of a thin material, and that the items in Saepharn's pockets — the lighter, the cut straws, and the bag filled with a crystalline substance — were sufficiently distinctive that the officer was able to identify them through patting, without additional improper manipulation. Saepharn challenges this finding, but he has the burden of showing that the finding is clearly erroneous. [10]

Here, the record does not leave us with a "definite and firm conviction" that the superior court's finding is mistaken. [11] Rather, the record affirmatively supports the superior court's conclusion that the patting in this case did not exceed lawful limits.

We note, in particular, that Sims *failed* to discover the smaller plastic baggie that was in Saepharn's right pocket — the same pocket that contained the lighter and the cut straws. The fact that Sims identified the presence of the lighter and the cut straws, but failed to identify the presence of the baggie, supports the superior court's finding that Sims was merely patting Saepharn's pocket, and not squeezing, sliding, or otherwise manipulating the objects within the pocket.

In addition to Sims's tactile perception of the bag (*i.e.*, his perception that it contained a crystalline substance), there were the other circumstances known to the

---

[9]   *Id*. at pp. 403-04.

[10]   *See Booth v. State*, 251 P.3d 369, 373 (Alaska App. 2011) (explaining that a trial court's findings of historical fact are reviewed under the "clearly erroneous" standard of review).

[11]   *Ibid*.

police at the time: the behavior of the driver before and during the stop, the quick opening and closing of the passenger door just before the car stopped, the presence of cut-off straws in the pockets of both the driver and Saepharn, and Saepharn's refusal to remove his hand from his pocket (until the officers used force). Given the combination of these factors, we conclude that Sims had probable cause to believe that the crystalline substance he felt in Saepharn's pocket was contraband. Sims was therefore authorized to remove the baggie from Saepharn's pocket.

*Conclusion*

The judgement of the superior court is AFFIRMED.